UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STIRLING LARKIN,

         Plaintiff,

 -against-

SABER AUTOMOTIVE, LLC et al.,

         Defendants.

23-cv-2428 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

## BACKGROUND

Stirling Larkin has sued Saber Automotive (also known as Rezvani Motors) for its failure to deliver his "tank." Back in December 2021, Larkin was thinking about buying Saber's "TANK Military Edition." Dkt. 74 ¶ 21. It comes standard with, among other features, bulletproof glass, "[u]nderside explosive protection," "Electromagnetic Pulse (EMP) Protection," a "Smoke Screen," a "Thermal Night Vision System," "Electrified Door Handles," "Blinding Lights," and gas masks. Dkt. 69-11 at 5. Its base price was $259,000. *Id.* Larkin tacked on dozens of features, including an "Armored Escape Hatch." *Id.* at 8. He also upgraded the engine to the "Demon Performance Package" (though he later opted for an even more souped-up, 1300-horsepower engine). Dkt. 74 ¶¶ 3, 25. With all these added bells and whistles (though the "Siren" and "Intercom System" come standard), the total price was $521,680. Dkt. 69-11 at 5.

After configuring—but before committing to buying—his dream tank, Larkin had a series of conversations with a Saber employee, Cynthia Karimi. Dkt. 74 ¶¶ 5–6. Nearly all of these conversations were by phone, though they also exchanged some emails. ¶¶ 5–18. Naturally, the parties now dispute what was said on the phone calls and what was implied by the emails. *Id.* Larkin says Karimi assured him of, among other things, a 12- to 16-week delivery window, a two-year warranty, and that his chosen engine was "drop in ready." ¶¶ 6, 9, 18. Karimi says she doesn't recall making those representations. *Id.*

Ultimately, Larkin signed a "DocuSign package" that the parties agree "formed the operative agreement between the parties." ¶ 28. Stepping back for a moment, this agreement on the agreement is odd. Exactly *what* the parties agreed to in the DocuSign package is unclear. As discussed below, the DocuSign is a relatively informal document and contains a sweeping disclaimer. More fundamentally, though, it was never intended to be the parties' final agreement. The DocuSign says Larkin "agree[s] to provide a 25% deposit" for Saber "[t]o begin production." Dkt. 69-11 at 4. And it contemplates a later "build service agreement" that was never executed here. *Id.* Whether the DocuSign governed more than just the initial deposit and preliminary production period is unclear. That question was not the subject of this motion. But the Court mentions this issue because

it is unavoidable when interpreting the DocuSign and because it implicates Larkin's non-contract claims.

After signing the DocuSign agreement, Larkin wired over his $130,420 deposit. Dkt. 74 ¶ 27. The first page of the agreement was an "order form." ¶ 21. It stated, "I would like to place an order for a 2022 Rezvani TANK Military Edition." *Id.* It also promised that "[u]pon receipt of your deposit, a conf[i]rmation letter will be sent to you acknowledging your payment and stating your position on the production line, along with [a] general estimate of when your car will be built and your warranty and build service agreement." ¶ 22.

The pages after the order form were the "configuration document," showing the "various options" that Larkin had picked from the website. ¶ 23. Along with those features, the top of each page (above the phrase "Your Tank Military Edition," under which the features were listed) had the Rezvani logo, a rendering of the tank, and the following paragraph in somewhat smaller font:

> We look forward to building your vehicle. Upon receiving your initial deposit, you will then receive a build agreement to review and sign. The remaining balance for your vehicle will be paid in stages as build milestones are completed. We will send you pictures and you are welcome to visit the factory. Build times are approximately 12–16 weeks depending on options.

¶ 26. And the bottom of each page, in similarly small font, had the following: "Disclaimer: The information contained in this website is for general information[al] purposes only." Dkt. 69-11 at 5–8. The first page of this "configuration document" is reproduced below:



Dkt. 69-11 at 5.

The order didn't exactly go as Larkin had hoped. For starters, Larkin says he didn't receive the build agreement or warranty language after he submitted his deposit. Dkt. 74 ¶ 29. He also says there was no "factory": Saber doesn't actually manufacture the tanks in a traditional sense; it buys a new Jeep Wrangler and then "converts" it through a series of subcontractors. ¶¶ 33–34. And perhaps most frustratingly, the build took far longer than sixteen weeks. Throughout this time, Larkin would periodically reach out for updates. Many of Saber's answers did not exactly inspire confidence. Sometimes, Karimi would say she needed to consult with someone else and then fail to follow up. ¶¶ 41–45. Other times, Karimi would send emails that were about an entirely different vehicle or that mentioned features that Larkin hadn't chosen. ¶¶ 38, 49–52, 70, 72. And though both the tank's construction and Karimi's responses were slow, Larkin was consistently assured that the tank's build was proceeding "at a good pace." ¶¶ 48, 54, 58, 63, 69.

In June 2022, about six months after Larkin placed his order, Saber asked for an update on Larkin's "payment status"—Saber wanted his second installment payment of more than $230,000. ¶ 66. Larkin wrote back that he was "getting quite frustrated" by the slow, evasive, and sparse updates. ¶ 67. Over the next two months, Larkin exchanged more emails and had another meeting with Karimi, and he paid the second installment in August. ¶ 75. Over the next several months, Larkin continued to receive not-so-assuring assurances, and it became clear that the tank would not be delivered until 2023. *See* ¶¶ 79–87.

On January 17, 2023, Larkin wrote to Saber through his lawyer, "demand[ing] that certain items be provided within 14 days." ¶¶ 93–96. Among other things, Larkin asked for a "complete itemization of all work that has been done … and all items that remain to be performed" as well as "written confirmation" of a two-year warranty. ¶ 95. The letter said that if Saber failed to comply, Larkin "intend[ed] to cancel his order and demand the immediate return of all monies." ¶ 96.

On January 23, Larkin sent another letter, which said that "several concerns and items raised in [his first] Letter remain unaddressed." ¶ 97. On January 27, Larkin received one paragraph of warranty language, but it was "a limited 1-year warranty" rather than the "expansive 2-year warranty" that he thought he'd been promised. ¶¶ 98–99. On January 30, Larkin requested "the complete documentation that sets forth the warranty terms," and Saber sent over (apparently for the first time) an unexecuted build agreement, which contained the one-year limited warranty and other information. ¶ 101. The build agreement also revealed that the tank "might not be street-legal and is intended for off-street use," "might not be emissions compliant in the state in which you intend to operate it," and that any payments to Rezvani "are not refundable." ¶ 103. Larkin says this information contradicted Saber's express and implied promises. ¶ 104.

Despite the January 31 deadline in Larkin's first letter, Saber continued to update Larkin in February and early March. In particular, on March 2, Saber sent photos of the tank. ¶ 113. Larkin says those photos revealed that several of his requested features hadn't been installed or had been installed incorrectly. *Id.* The following day, on the grounds that Saber failed to confirm a two-year warranty or provide an itemized list of work done and remaining, Larkin canceled his order. ¶ 117.

3

Saber tried to salvage the deal, but to no avail. On March 7, Saber told Larkin that the order was "not refundable" and that the "car will be completed next week." ¶ 120. On March 10, Saber sent another letter, saying the "Tank is 100% complete" and "ready for delivery." ¶ 121. Larkin "did not retract his cancellation, rejected this tender, and filed this lawsuit." ¶ 122. Saber listed the tank for sale in April 2023. ¶ 145. Saber eventually sold it to a buyer in Mexico for $125,000. ¶¶ 147–148.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).

## DISCUSSION

### I. Breach of contract

#### A. The nature of the contract

At the threshold, the parties dispute what kind of contract they had. Larkin says he agreed to buy a tank and a tank is a good, so the Uniform Commercial Code (UCC) applies. Saber says the contract was for services, "the conversion of a Jeep Wrangler into … a 'Tank,'" so the common law of contracts applies. Dkt. 72 at 5. Larkin is right.

The UCC "applies to transactions in goods." N.Y. U.C.C. § 2-102. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[.]" § 2-105. "Whether a contract is for the sale of goods or for services provided is a question of fact." *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 666 (S.D.N.Y. 1996) (citing *Farm Automation Corp. v. Senter*, 443 N.Y.S.2d 765, 765 (2d Dep't 1981)), *aff'd*, 122 F.3d 1055 (2d Cir. 1997). But "[g]iven a sufficient factual record, a district judge properly may determine as a matter of law whether an agreement falls under the UCC." *Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*, 966 F. Supp. 167, 168 (E.D.N.Y. 1997); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742 (2d Cir. 1979) (noting that "the district court was justified in concluding, as a matter of law, that the contract was one for a sale of goods" on a motion to dismiss); *CVD Equip. Corp. v. Taiwan Glass Indus. Corp.*, 2014 WL 6057395, at *4 (S.D.N.Y. Nov. 13, 2014).

Here, there is no genuine dispute that this contract was for a good. The contract itself refers to an "order for a 2022 Rezvani TANK Military edition," a "production line," "the factory," and "building your vehicle." Dkt. 69-11 at 4–5; *see Triangle Underwriters*, 604 F.2d at 743. It also includes a picture of the final product and lists all the physical features of the tank (as well as their

4

prices), but it fails to list (let alone charge for) any services. *See Triangle Underwriters*, 604 F.2d at 743. It mentions a warranty in passing, but a promise of maintenance or a warranty isn't enough to make a contract one for services. *See id.*; *Hull v. Moore's Mobile Homes Stebra Inc.*, 625 N.Y.S.2d 710, 711 (3d Dep't 1995). On its face, then, the contract is plainly one for "specially manufactured goods." Of course, "[m]anufacture always involves some services." *Propulsion Tech., Inc. v. Attwood Corp.*, 369 F.3d 896, 901 (5th Cir. 2004). But the UCC's "unqualified statement that goods include 'specially manufactured' goods eliminates the need to determine whether the service aspect of the transaction is dominant or is merely incidental." David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 2-105:157 (3d ed. 2023).

Saber's first counterargument only proves the point. It says that "Saber itself bought a Jeep Wrangler that acted as the 'donor' vehicle … and registered that vehicle in its own name … even before Larkin placed his order." Dkt. 72 at 5. This process shows that Larkin was buying the tank and that the Jeep was just an input in the manufacturing process. It would be a closer case in a *Pimp My Ride* situation; that is, if Larkin already owned the Jeep and brought it to Saber for upgrades. But when Saber bought the "donor" Jeep even before Larkin's purchase, it is clearly a production input, and the contract was for the final tank.

Saber also points to its "service" warranty. But Saber cites no authority suggesting that a warranty can change a contract for goods into one for services. And the warranty language is part of the "Rezvani Motors Services Agreement" (ironically, it is also called the "build agreement"), which Larkin didn't receive until January 2023, and which he never signed. The only agreement at issue on this motion is the DocuSign, which included the order form and the tank's configuration. Dkt. 74 ¶ 28. Plus, even if the separate "Services Agreement" were relevant and an agreement for services, the DocuSign would still be governed by the UCC. *Lawrence's Anderson on the Uniform Commercial Code* § 2-105:78 ("When there are two contracts, one for goods and one for services, applying the predominant factor test is not necessary. The goods contract, being a separate contract, is governed by Article 2.").

### B. Perfect tender

Under the UCC, a seller must make a perfect tender. That is, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may" reject the goods. N.Y. U.C.C. § 2-601. Larkin says Saber tendered the tank on March 10, when it said the tank was "100% complete" and "ready for delivery." Dkt. 74 ¶ 121. But jumping all the way to this point ignores everything that happened in between. Most importantly, Larkin canceled his order before any tender was made. And "the repudiation of a contract by the buyer eliminates the need for further performance by the seller." *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978) (citing N.Y. U.C.C. § 2-610(c)). Because Larkin canceled the order (rightly or not), Saber didn't have to tender the tank.

Larkin hints at the argument that even if Saber wasn't obligated to tender the tank, it still did so. But that fact is disputed. Saber contends that its letter was "a settlement proposal, notifying counsel for [Larkin] that the vehicle would be sold." Dkt. 74 ¶ 121. (Indeed, the letter itself says

5

"the following information is communicated for purposes of settlement only." Dkt. 69-52 (capitalization omitted).) And even if Saber offered a nonconforming tank to Larkin after his repudiation, Saber might well have been within its rights to do so: "Where the goods are unfinished an aggrieved seller may in the exercise of reasonable commercial judgment for the purposes of avoiding loss … either complete the manufacture and wholly identify the goods to the contract or cease manufacture and resell for scrap or salvage value or proceed in any other reasonable manner." § 2-704. Given that Larkin said he was canceling, it might well have been "reasonable" to complete the tank (even if not exactly to Larkin's specifications), see if Larkin was still interested, and then try to sell it to someone else. And it's Larkin's burden "to show the commercially unreasonable nature of the seller's action in completing manufacture." *Id.* cmt. 2.

But deciding that Saber was not required to make a perfect tender is not the end of the story. There is still the question whether Larkin breached by canceling or had the right to do so. If Larkin had "reasonable grounds for insecurity," he could "demand adequate assurance of due performance." § 2-609(1). And if Saber failed, "within a reasonable time," to provide "such assurance of due performance as is adequate under the circumstances," then Saber would be the repudiating party. § 2-609(4). This analysis is chock-full of factual questions and was not part of this motion. So the Court denies Larkin's motion for summary judgment on his perfect-tender theory of breach.

### C. Timeliness

One term that Larkin says was breached even before he canceled was Saber's promise to deliver the tank within "approximately 12–16 weeks." Dkt. 69-11 at 5. Yet Larkin has again failed to grapple with a threshold question—whether "12–16 weeks" was a binding promise. This issue presents a question of fact. *See Ronan Assocs., Inc. v. Loc. 94-94A-94B, Int'l Union of Operating Eng'rs*, 24 F.3d 447, 449 (2d Cir. 1994). And it is genuinely disputed: The paragraph containing the "12–16 weeks" language was set apart from the order form and the tank's features, and it contained general language like "approximately 12–16 weeks," "welcome to visit the factory," and so on. Dkt. 69-11 at 5. The contract also included the disclaimer that "information contained in this website is for general information[al] purposes only." *Id.* Plus, the "order form" page said, "Upon receipt of your deposit, a conf[i]rmation letter will be sent … stating your position on the production line, along with [a] general estimate of when your car will be built and your warranty and build service agreement." *Id.* at 4. Although this information wasn't sent along, all of these provisions suggest that the "12–16 weeks" language might not have been a binding promise. Nevertheless, a reasonable jury could read "approximately 12–16 weeks" to be making some promise, so Saber's motion on this term will also be denied.

Larkin dedicates a single footnote to his argument in the alternative: "[H]ad there been no delivery timeframe specified … a reasonable time for performance would nevertheless be implied." Dkt. 67 at 6 n.3; *see* N.Y. U.C.C. § 2-309. And Larkin asserts that "61 weeks after the initial order was placed was not a reasonable amount of time as a matter of law." Dkt. 67 at 6 n.3 (emphasis omitted). But that assertion is not enough to dispel any genuine dispute. "[W]hat is a reasonable time is for the trier of the facts to determine considering the subject matter of the contract, what the parties contemplated at the time it was entered and the circumstances surrounding

6

performance." *Feinman v. Kaderali*, 548 N.Y.S.2d 359, 360 (3d Dep't 1989) (cleaned up); *see also Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, 2019 WL 1494398, at *9 (S.D.N.Y. Apr. 2, 2019). There are disputed facts here, such as how long custom-built tanks typically take to make, what the parties contemplated, and the other circumstances surrounding performance. So Larkin has not done enough to displace the fact-finder's usual role in deciding what is "reasonable."

Finally, related to the timeliness argument, Larkin says Saber breached by failing to deliver a "*2022* Rezvani TANK." That is, Saber determines the "year of the vehicle" by the "year of presentation," Dkt. 74 ¶ 92, so Larkin says that calling it a "2022" model set "an express outside date for performance within 2022," Dkt. 67 at 7. This argument also suffers from an intent-to-be-bound problem. "2022 Rezvani TANK" appears only on the order form, and there is no evidence to suggest that it was intended to serve as anything other than a label for the product. And again, the order form said a different document would have more specific information about when the tank would be done. Larkin can argue that the parties understood the label as conveying a deadline, but that question is not beyond genuine dispute.

### D. Implied warranties of merchantability and for a particular purpose

Larkin next claims that Saber breached the implied warranties of merchantability and fitness for a particular purpose. For merchantability, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-314(1). "Goods to be merchantable must be at least such as … are fit for the ordinary purposes for which such goods are used[.]" § 2-314(2)(c). The inquiry "into whether the product in question was 'fit for the ordinary purposes for which such goods are used … focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 736 (N.Y. 1995). And as to fitness for a particular purpose, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is … an implied warranty that the goods shall be fit for such purpose." § 2-315.

Larkin says Saber breached both warranties by selling him a car that wasn't street legal. But the basic question of whether the tank was street legal is disputed. The unexecuted build agreement said the tank "might not be street-legal, [was] intended for off-street use," and "might not be emissions compliant in the state in which you intend to operate it." Dkt. 74 ¶ 103. All that language is noncommittal, as was the testimony of Saber's representative. *See* Dkt. 73-2 at 108:3–110:16.

Larkin points to some discovery material that says the engine was for "race use only" and "violates U.S., California … and local laws and regulations." Dkt. 74 ¶¶ 123–128. But Saber says some of that language applies to a different engine listed on the same invoice. ¶¶ 124–126. And the "race use only" language seems to be a boilerplate disclaimer from the subcontractor; it's unclear whether that's true of the engine as a legal matter. *See* Dkt. 69-53. Larkin also points to a handful of New York regulations banning some features (like strobe lights). Dkt. 74 ¶ 128. But this contention is barely mentioned in his briefs, and these regulations are loaded with ambiguities

7

for which Larkin has offered no reading or case law. *See, e.g.*, *id*. (citing a law banning vehicles "which emit[] unnecessary smoke"). So the tank's street legality is genuinely disputed. The Court also notes how strange it is that both sides are relying on invoices and manufacturer catalogs to prove whether something is street legal. Neither side has produced an expert opinion on the question or even tried to systematically compare the tank's features to the relevant law.

And there are more factual disputes too. On the warranty of merchantability, Larkin asserts that "a car must enable the purchaser to transport herself upon the streets and highways of this State or any other in a reasonably safe manner." Dkt. 67 at 13 (quoting *Hurley v. Suzuki 112 USA, LLC*, 22 Misc. 3d 1113(A), at *5 (Dist. Ct. 2008), *aff'd*, 924 N.Y.S.2d 309 (App. Term 2011)). But Saber wasn't selling any old car. It was selling something called the "TANK Military Edition." Whether the "customary, usual and reasonably foreseeable" use of this vehicle was the same as an ordinary car is a question of fact. And Larkin has not identified any case in which a car's failure to comply with regulations—rather than its dangerousness—rendered it nonmerchantable.

As for the warranty for a particular purpose, Larkin claims that Saber knew that "he intended to use the Vehicle in New York and Connecticut for on-street use." Dkt. 67 at 15. Larkin points to a few emails discussing how the vehicle might be received by his coworkers, difficulties related to finding a parking garage in New York City, and "registering" the car in New York or Connecticut. *Id.* (citing Dkt. 74 ¶¶ 11–14). The parties dispute what these emails conveyed and what was said during the in-person meetings on these topics. Dkt. 74 ¶¶ 43–45. Larkin's evidence has not displaced the usual rule that "[w]hether or not this warranty [of fitness for a particular purpose] arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting." N.Y. U.C.C. § 2-315 cmt. 1.

Finally, Larkin again fails to grapple with the fact that the tank was never delivered. So if Saber breached the implied warranties, it must have done so by anticipatory repudiation. Anticipatory repudiation requires "an overt communication" of an intention not to perform that is "positive and unequivocal." *Tenavision*, 379 N.E.2d at 1168 (internal quotation marks omitted). Applying this standard, Saber's communications are not enough to dispel any genuine dispute of fact.

### E. Good faith and fair dealing

Larkin argues that Saber also breached the implied covenant of good faith and fair dealing "[f]or the[] same reasons" as his breach-of-warranties argument. Dkt. 67 at 17. That is, Saber breached the covenant by making certain promises and then withholding contradictory information. *Id.* at 18. Given the discussion above, there are genuine disputes that preclude summary judgment on this claim.

## II. Magnuson-Moss Warranty Act

The parties have cross-moved on Larkin's claim under the Magnuson-Moss Warranty Act. Larkin says Saber "violated the [Act's] pre-sale warranty requirements." Dkt. 67 at 18 (capitalization omitted). The Act requires the Federal Trade Commission (FTC) to "prescribe rules requiring that the terms of any written warranty on a consumer product be made available to the consumer

(or prospective consumer) prior to the sale of the product to him." 15 U.S.C § 2302(b)(1)(A). Under the FTC's rules, a seller can comply by (1) "[d]isplaying [the warranty] in close proximity to the warranted product," (2) "[f]urnishing [the warranty] upon request prior to sale … and placing signs reasonably calculated to elicit the prospective buyer's attention," or (3) following certain steps to make the warranty available on the seller's website. 16 C.F.R. § 702.3(a)(1)–(2), (b)(2).

Saber says the claim fails for three reasons. First, it says the tank was a resale, so it is excluded under the Act's definition of "written warranty." 15 U.S.C. § 2301(6). But as explained above, the contract was one for a sale of a newly manufactured good, not a resale.

Second, Saber says the warranty was for services, so it is not covered by the Act. Saber cites 16 C.F.R. § 700.1(h) for this argument, but it takes that provision out of context. That provision clarifies that warranties "on replacement parts" are covered by the Act, while "warranties which apply solely to a repairer's workmanship in performing repairs are not." *Id.* Saber was not a "repairer" here. More generally, the Act applies to "written warrant[ies]" on "consumer product[s]." 15 U.S.C. § 2302(a); *accord* 16 C.F.R. § 700.1(a). A "written warranty" includes promises "relate[d] to … workmanship." 15 U.S.C. § 2301(6)(A). The Act also covers promises to "repair, replace, or take other remedial action with respect to [the] product." § 2301(6)(B).

Saber's warranty fits squarely into the Act. The tank is a consumer product. *See* 15 U.S.C. § 2301(1); 16 C.F.R. § 700.1(a). Saber emphasizes that the warranty is phrased in terms of "provid[ing] a limited warranty for [Saber's] Services" and "replac[ing] or repair[ing] any defective aspects of the Services." Dkt. 69-42 at 1–2. But "Services" is defined as "certain services to build, outfit, co[n]vert, or otherwise modify certain elements of the Vehicle." Dkt. 69-42 at 1–2. In a nutshell, the warranty covers the tank, its workmanship, and any replacements and repairs to the tank. So the warranty is covered by the Act.

Third, Saber says Larkin is not a "consumer" protected by the Act. Under 15 U.S.C. § 2301(3), the "term 'consumer' means a buyer … of any consumer product" (and two other things not applicable here). Saber says Larkin wasn't a "buyer" because he never completed the purchase of the tank. But it cites no authority for that reading of "buyer." Under the UCC, "'Buyer' means a person who buys *or contracts to buy* goods." N.Y. U.C.C. § 2-103(1)(a) (emphasis added). Applying the UCC's definition of "buyer" makes sense because the Act was "intended … to supplement, not supplant … state law." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315, 1319 (2d Cir. 1990). And the relevant edition of Black's Law Dictionary also adopted the UCC's definition. *Buyer*, Black's Law Dictionary (5th ed. 1979) ("One who buys; a purchaser, particularly of chattels. A person who buys or contracts to buy goods. U.C.C. § 2-103(1)(a)[.]"). Here, given the ambiguity of the DocuSign, there is a genuine dispute over whether Larkin had contracted to buy the tank or at what point he did so. So the Court denies both sides' motions.

### III. Larkin's other claims

#### A. Unjust enrichment

Saber moves for summary judgment on Larkin's unjust-enrichment claim. For this claim, Larkin "must show that (1) the other party was enriched, (2) at [his] expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (cleaned up). Saber says the claim fails because of "the existence of a valid contract governing the [same] subject matter." *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 33–34 (N.Y. 2005). But as discussed at the beginning of this opinion, it's unclear what the DocuSign agreement covers. And if no valid contract governed the second installment payment, for example, Larkin might be able to recover on an unjust-enrichment theory. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). So the Court denies summary judgment on this claim.

#### B. Conversion

Saber next moves for summary judgment on Larkin's conversion claim. "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). Larkin's claim seems to be that Saber misappropriated some money he paid for the tank by failing to dedicate it to his tank's construction.

Saber makes two arguments. First, it argues that for money to "be the subject of a conversion action, the money must be held in a specific, identifiable fund and subject to an obligation to return or otherwise treat in a particular manner the specific fund in question," and Larkin hasn't made that showing. Dkt. 62 at 10 (cleaned up) (quoting *Citadel Mgmt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000)). Second, Saber argues that the conversion claim is duplicative of the contract claim. The first argument is enough to dispose of this claim. Larkin "contests that all his funds were used for the construction of the Vehicle," Dkt. 75 at 25, but he fails to engage with the antecedent question: whether Saber had any duty to treat his money specially. Here, it seems that Larkin's money, once paid to Saber, was fungible. So he has not carried his burden, and the Court will grant summary judgment for Saber on the conversion claim.

#### C. Fraud

Saber also moves for summary judgment against Larkin's fraud claims. Larkin pleaded claims for "fraud" and for "fraud in the inducement." Dkt. 56 at 19, 21 (capitalization omitted). In reality, he just has two theories of fraudulent inducement: he says he was fraudulently induced to form the contract and then fraudulently induced to make his second installment payment. *See* Dkt. 75 at 15–21.

"Generally, to establish a fraudulent inducement claim, a plaintiff must prove (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably

10

relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Ent., LLC*, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018) (internal quotation marks omitted).

Saber's first argument is that Larkin is simply trying to "recharacterize his breach of contract claim as fraud[]." Dkt. 62 at 12. But "New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). And Larkin points to a series of allegedly misleading collateral statements or promises: that Saber had a "factory" and that he could visit it, that the tank came with a two-year warranty, that Saber would handle registration, and so on. *See* Dkt. 75 at 15, 20. Saber says it never promised to register the tank, but that question is disputed, *see* Dkt. 74 ¶ 45, and is not the sole basis for this claim anyway.

More generally, Saber asserts that these "purported misrepresentation[s]" were not collateral to the parties' contract. Dkt. 78 at 4–5. It says that they "all bear upon the basic contract terms and the conversion of the vehicle that was the subject of the contract, and are therefore not actionable." *Id.* at 5. But it has not identified any contract terms that address each of Larkin's issues. So this argument fails. *See Wall*, 471 F.3d at 417; *Hobart v. Schuler*, 434 N.E.2d 715, 716 (N.Y. 1982) (affirming denial of summary judgment when "the fraudulent representation which forms the basis of [the fraudulent inducement claim] is not specifically contradicted by any of the detailed representations or warranties contained in the [written] agreement").

Saber also argues that there is no evidence that it knew its statements were false. Yet scienter is a quintessential jury question. *See Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("[W]here subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."). Whether to credit Saber's representatives' denials is a matter for the jury. And Larkin points to (among other evidence) Saber's strong incentive to tell Larkin what he wanted to hear, even if it wasn't always true. This is enough, given that courts are "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (internal quotation marks omitted). So the motion will be denied with respect to the fraud claims.

### D.  New York General Business Law § 349

Saber has moved for summary judgment against Larkin's claim under New York General Business Law § 349. Under that law, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). Saber says Larkin has failed to satisfy the first element.

Saber first says it never did anything deceptive. But as explained throughout this opinion, that is a genuinely disputed question of fact. And it is especially fact-intensive given that the New York Court of Appeals has "defined 'deceptive acts' objectively as acts that are 'likely to mislead a

11

reasonable consumer acting reasonably under the circumstances.'" *Id.* (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).

Saber also says that this case involves no acts "directed at consumers." "Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior.… Plaintiff, thus, need not show that the defendant committed the complained-of acts repeatedly … but instead must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." *Oswego*, 647 N.E.2d at 744. Form contracts, on the other hand, in which "a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers" can support a § 349 claim. *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004).

Larkin says this agreement falls into the latter category, and that might be true. It seems that anyone who orders a Saber tank will get the same DocuSign with the same alleged misrepresentations: that build times are "approximately 12–16 weeks," that customers are "welcome to visit the factory," that customers will learn additional terms and receive the warranty once they make an "initial deposit," and so on. Dkt. 69-11 at 4–5. This "standard document[]" is enough to show consumer-oriented conduct for summary-judgment purposes. *Oswego*, 647 N.E.2d at 26–27. So the motion will be denied with respect to this claim. But as noted throughout, the DocuSign seems intended to be a preliminary agreement. It's not clear whether the DocuSign is the agreement on which consumers typically rely. It may be that the failure to provide the build agreement here is a one-off, which could bear on whether this case involves "consumer-oriented conduct."

### E. Punitive damages

Saber next says Larkin can't recover punitive damages. It argues that when an alleged fraud is "directly related to the contract between the plaintiff and defendant," a showing of "public harm" is required for punitive damages. Dkt. 62 at 14 (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 25 (2d Cir. 2003)). It says public harm is a "a gross and wanton fraud upon the public" rather than "an isolated transaction incident to an otherwise legitimate business." *Id.* (quoting *TVT Records v. Islands Def Jam Music Grps.*, 412 F.3d 82, 95 (2d Cir. 2005)). Saber hasn't argued that its conduct wasn't "gross and wanton" but just that "only a private right, and not a public right is involved." *Id.* (quoting *Fraser v. Doubleday & Co.*, 587 F. Supp. 1284, 1289 (S.D.N.Y. 1984)).

This argument should sound familiar. It more or less tracks the § 349 analysis in the previous section. And Larkin says as much, arguing that the misrepresentations in the form contract present a public harm. Saber fails to engage with this argument. *See* Dkt. 78 at 7–8. So the Court will let the demand for punitive damages survive for now. But the Court notes that punitive damages were not a focus of the summary-judgment briefing, and the Court is skeptical that Larkin is entitled to them. With the motions in limine, Saber may renew its motion to strike the punitive-damages requests. The parties should pay particular to attention to the specific requirements to recover punitive damages for each of Larkin's claims.

## IV. Saber's counterclaims

Finally, Larkin moves for summary judgment on Saber's counterclaims. Saber's sole answer to any of Larkin's arguments is one sentence in its opposition brief: "Defendants' counterclaim for breach of contract should … not be dismissed" because of "the existence of extensive triable issues of fact." Dkt. 72 at 17. As outlined above, there are genuine disputes underlying who breached. But Saber has not responded to Larkin's arguments for granting summary judgment against Saber's claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and declaratory relief. So the Court deems those claims abandoned and Larkin's arguments against them conceded. *See Rosenberg v. LoanDepot, Inc.*, 2023 WL 1866871, at *4 n.3 (S.D.N.Y. Feb. 9, 2023). The Court will grant summary judgment against for Larkin on those claims.

## V. Other disputes

Apart from the merits, the parties have several procedural spats. First, Saber objects that Larkin incorporated his Local Rule 56.1 statement by reference as his statement of facts in his opening brief. But Larkin acknowledged the error and wrote a full statement of facts in his brief opposing Saber's motion. And Saber incorporated its opening brief's statement of facts in its response brief, so Larkin didn't gain an advantage by his error. Relatedly, Saber complains about the length of Larkin's Local Rule 56.1 statement, but it is Saber's responses to Larkin's statements that are argumentative, rambling, and repetitive, leading to the excessive length.

Second, Saber objects to Larkin's excessive use of footnotes. It points to this Court's individual practices, which counsel that "footnotes are highly disfavored and should be used sparingly." And it says the Court should impose "a consequence." Dkt. 78 at 2. But there is no bar on excessive footnotes, and it would be unfair to impose one retroactively. Counsel may choose to ignore the Court's advice at their own peril. Indeed, here, Larkin's constant footnoting and running up the citation score often reflected a lack of focus more than anything else. The Court will, however, make a change for this case going forward: any footnotes used in future briefing in this case (by either side) must match the font size and spacing of the body text. That is, footnotes should offer no page-count advantage going forward.

Third, Larkin has renewed his motion for discovery sanctions based on Saber's spoliating evidence by selling the tank. Specifically, Larkin wants an "adverse inference against the Defendants that the Vehicle was never completed to Plaintiff's specifications." Dkt. 67 at 23. Yet given the analysis above, it is difficult to see the relevance of this adverse inference. It would support Larkin's perfect-tender argument, but perfect tender is not the right frame of reference. The Court will again deny the motion without prejudice to renewal before trial in the event that Larkin can convince the Court that the issue will be relevant at trial.

## CONCLUSION

For these reasons, the motions for summary judgment are GRANTED IN PART AND DENIED IN PART. Plaintiff's motion is granted with respect to Defendants' counterclaims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, and declaratory relief.

Defendants' motion is granted with respect to Plaintiff's claim for conversion. Both motions are otherwise denied. The Clerk of Court is directed to close Dkts. 61 and 66.

The parties' letter motion to adjourn the final pretrial conference and trial is also GRANTED IN PART AND DENIED IN PART. The trial date will remain the same. But the final pretrial conference will be moved to July 2, 2024, at 2 p.m. (The parties may propose another time on July 2 or 3 if that time does not work.) The joint pretrial materials will thus be due on June 18, 2024. The Clerk of Court is directed to close Dkt. 85.

SO ORDERED.

Dated: June 6, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge

14